IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| CAMDEN COUNTY, GEORGIA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | Case No. 2:14-cv-00020-LGW-JEG |
| v. | * | |
| | * | |
| LEXON INSURANCE COMPANY | * | |
| | * | |
| Defendant. | * | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

COMES NOW, Camden County, Georgia, by and through its counsel, and files this its first amended complaint against Lexon Insurance Company ("Lexon"), as follows:

### Parties and Jurisdiction

1. The plaintiff, Camden County, Georgia, is a body corporate and politic authorized by and organized pursuant to Article IX, Section I, *et seq.*, of the State of Georgia Constitution.

2. Defendant Lexon is an insurance company organized and existing under the laws of Texas, with its principal office located in Louisville, Kentucky and at all times material hereto was (and is) duly authorized to transact business as a surety in Georgia.

3. At all times relevant, the defendant regularly conducted business in the State of Georgia.

4. The events giving rise to the causes of action set forth below occurred in Camden County, Georgia.

5.	The plaintiff has sustained damages in excess of $16,412,467.50.

6.	For the forgoing reasons, and pursuant to 28 U.S.C. 1332, the Court has diversity jurisdiction over the parties.

7.	Venue is proper in this Court..

## Statement of Facts

8.	The plaintiff hereby incorporates by reference all preceding paragraphs.

9.	On August 10, 2005, Bridge Pointe at Jekyll Sound, LLC ("BPJS") was incorporated in Georgia. This entity was a subsidiary of Land Resources Company. Shortly thereafter, efforts were initiated by BPJS to develop the Bridge Pointe at Jekyll Sound subdivision, which is located in northern Camden County.

10.	The plans for this subdivision included the development of more than 600 residential lots.

11.	As called for by Camden County's development ordinances, BPJS secured subdivision bonds to ensure the completion of Bridge Pointe's infrastructure.

12.	BPJS obtained the bonds, which provided $16,412,467.50 in performance guarantees, from the defendant in this case, Lexon.

13.	The purpose of these subdivision bonds was to ensure that BPJS properly installed streets, sewers, electrical and telephone conduit, and other infrastructure prior to the acceptance of some, or all, of the infrastructure by Camden County.

14.	In October of 2008, which was after the sale of several hundred lots but prior to

the initiation of construction on the subdivision's infrastructure, Land Resources and BPJS filed for Chapter 11 bankruptcy protection in the Middle District of Florida.

15. Part of BPJS's bankruptcy estate included approximately 286 unsold lots in Bridge Pointe.

16. Shortly before BPJS filed for bankruptcy protection, Steve Howard, the Camden County Administrator, learned of BPJS's financial difficulties. As a result, on September 8, 2008, Mr. Howard drafted and sent a letter to David Campbell, the President of Lexon.

17. In this letter, Mr. Howard placed Lexon on notice that it was possible that BPJS/Land Resources would be unable to make the infrastructure improvements in Bridge Pointe and that Camden County would look to Lexon to make those improvements.

18. Mr. Howard's letter requested that Lexon indicate, in writing, Lexon's intent should BPJS/Land Resources fail to complete the improvements.

19. On September 15, 2008, Mr. Howard received a letter from Lexon which acknowledged receipt of his September 8, 2008, letter and provided the contact information for Bruce Maas, an attorney in Pittsford, New York, who was identified as the individual who would be handling the matter on behalf of Lexon.

20. On September 23, 2008, after Mr. Maas failed to return several telephone calls initiated by Mr. Howard, Mr. Howard drafted a letter to Mr. Maas asking that

Mr. Maas contact him or the Camden County Attorney, O. Brent Green, Esq., regarding the surety bonds.

21. On October 7, 2008, Mr. Howard received a letter from Mr. Maas in which Mr. Maas asked to be provided with various documents along with an engineering estimate to complete the outstanding infrastructure improvements. Mr. Maas indicated that this information was necessary so that Lexon could investigate the claim that had been submitted by the county.

22. In late 2008 or early 2009, Camden County officials met with an engineer who was dispatched by Lexon to evaluate the costs associated with completing the infrastructure improvements.

23. Throughout this period of time, Camden County officials believed that Lexon was acting in good faith and that Lexon would continue to act in good faith.

24. Aware that it had $16,412,467.50 in exposure, Lexon began to look for ways to avoid its obligations to Camden County.

25. Lexon's plan for avoiding its obligations is discussed by David Campbell, Lexon's President, in Lexon's 30(b)(6) deposition in <u>Bond Safeguard Insurance Company v. Diane Elizabeth Ward, et al.</u>, United States District Court, Middle District of Florida, Orlando Division, Case No. 6:09-cv-1504-Orl-28GJK, Docket No. 91, pages 275-279.[1]

---

[1] Mr. Campbell deposed:
"Q: Okay. And you were telling me that Bond Safeguard gave both cash and land?
A: And land.
Q: Please explain how that worked.
A: We bought the property at auction.

26. Lexon's plan to avoid full payment of its $16,412,467.50 exposure began with the purchase of the 286 unsold lots in Bridge Pointe that were part of BPJS's bankruptcy estate.

27. In furtherance of its plan, several new corporate entities were formed.

28. On January 27, 2009, or roughly four months after Mr. Howard placed Lexon on notice of its claim, an entity known as Camden County Development, LLC (hereinafter referred to as "CCD") was incorporated in the State of Florida. CCD's manager was, and remains to this day, Thomas A. Dieruf. Mr. Dieruf also happens to serve as Lexon's Chairman of the Board.

29. On February 13, 2009, the Jekyll Sound Development Company, LLC (hereinafter referred to as "JSDC") was incorporated in Georgia. Upon information and belief, JSDC was incorporated by, or at the request of, Mr. Dieruf and Mr. Dieruf is the manager of JSDC.

---

Q: Which property?
A: The – Bridges at Jekyll Sound [sic]. We bought it at auction for $3.2 million, something like that, and then we subsequently bought another property which was not the subject of the bonds, and we bought this with our personal money, and that was a marina property that was close by that we thought would enhance the value of the Bridges at Jekyll Sound [sic].
We gave both these properties, plus the cash, to – I'm not sure what the name of the entity was, I don't remember, but that replaced our bonds and we – so for the total consideration of now a little over $9 million we exonerated $17 million worth of bonds.
Q: How much – sorry.
A: Our cost to complete on that was approximately 16 million something, so we saved a significant amount of money."
Bond Safeguard Insurance Company v. Diane Elizabeth Ward, et al., United States District Court, Middle District of Florida, Orlando Division, Case No. 6:09-cv-1504-Orl-28GJK, Docket No. 91, pages 275-279.

30. On January 23, 2009, Emerson Properties, LLC (hereinafter referred to as "Emerson") was incorporated in Tennessee. Emerson was incorporated by George "Boog" Potter, with whom Lexon already had a business relationship.

31. Mr. Potter, along with his associates Mike Martinez, Steve Williams, Jr., and Steve Williams, Sr., are individuals from the State of Tennessee who held themselves out to be developers specializing in the completion of large-scale residential developments. Mr. Potter, *et al*, had already developed a relationship with Lexon by virtue of working on a development known as Norris Lake, which is located in Tennessee. Similar to this case, that development was initiated by Land Resources and was secured by bonds provided by Lexon. Upon information and belief, Mr. Potter, *et al*, secured the release of those bonds from the obligee as part of an arrangement which reduced Lexon's exposure by approximately 50%.

32. The sale of the subject lots to Emerson Properties, LLC was approved on or about February 17, 2009.

33. Upon information and belief, these lots were acquired from the bankruptcy estate for approximately $3,200,000.00.

34. The funds used to purchase these lots were provided by Lexon and are the very same funds that Lexon was obligated to use towards the completion of infrastructure improvements in Bridge Pointe.

35. Lexon contends that it made numerous payments under the Bridge Pointe bonds totaling $8,354,009.44. Lexon claims to have made these payments on: January

22, 2009, February 17, 2009, February 19, 2009, March 3, 2009, August 28, 2009, and February 23, 2010.  <u>Lexon Insurance Company v. Wells Fargo Bank, N.A.</u>, United States District Court for the Northern District of Georgia, Atlanta Division, Case No: 1:13-cv-03874-AT, Docket No. 1, p. 7.

36. Many of these payments took place shortly before, or at the same time, as Emerson's purchase of the lots in the bankruptcy sale.  Although Camden County was the named obligee on the surety bonds, it did not receive any of these payments and had no knowledge that they had been made.

37. Upon information and belief, the lots purchased from the bankruptcy sale were then held by Emerson, JSDC, and/ or CCD.

38. In late 2009, and with the knowledge and support of Lexon, "Boog" Potter, *et al*, initiated negotiations with Camden County representatives concerning the assignment of the surety bonds.

39. Mr. Potter, *et al*, claimed to be affiliated with a company known as MIROBO, LLC, the purported management company of JSDC, which, unbeknownst to Camden County, was organized by, or at the request of, Lexon's Chairman of the Board, Thomas Dieruf.

40. On December 15, 2009, Mr. Williams, Jr., gave a presentation to the Camden County Board of Commissioners in which various plans for the development of the Bridge Pointe subdivision infrastructure were discussed.

41. Mr. Williams, Jr., represented to the Board of Commissioners that if the Lexon bonds were assigned to BPJS Investments, LLC, which was apparently

incorporated by Mr. Potter, the bond proceeds would be used by BPJS Investments, LLC to make the needed infrastructure improvements in Bridge Pointe.

42. On January 5, 2010, Camden County passed a resolution which authorized the release of the Lexon bonds to BPJS Investments once bank-backed letters of credit, which were to serve as security for the release of the bonds, were provided by BPJS Investments. However, on February 2, 2010, Mr. Potter provided notice to Camden County that letters of credit could not be obtained by BPJS Investments.

43. Upon information and belief, Mr. Potter, *et al*, never made any efforts to obtain these letters of credit.

44. In lieu of providing letters of credit, Mr. Potter proposed that certain lots in Bridge Pointe, which Mr. Potter represented were owned by BPJS Investments, could instead be used as collateral. The value of these lots was represented to be at least $10,000,000.00. At the time, BPJS Investments had no legal interest in the subject lots.

45. Camden County agreed to this proposal and on February 16, 2010, the county approved a motion to release the Lexon bonds to BPJS Investments. These lots are identified in a Deed to Secure Debt and Security Agreement that was executed on February 19, 2010 between BPJS Investments and Camden County.

46. None of the entities involved in these events, including Lexon, disclosed to Camden County that these lots that were the same lots that Lexon caused to be

purchased in February of 2009 using the Lexon Bridge Pointe bond monies that were due to Camden County.

47. Shortly after Camden County released the bonds to BPJS Investments, Lexon and BPJS Investments, JSDC, and Mr. Potter, *et al*, finalized the deal that had been arranged amongst them.

48. As part of this deal, Lexon paid JSDC, an entity controlled by Mr. Dieruf, $4,000,000.00. Upon information and belief, this $4,000,000 was then transferred to and placed under the control of BPJS Investments and Mr. Potter, *et al*.

49. Lexon then caused to be transferred to BPJS Investments the aforementioned lots which were used as collateral in the Deed to Secure Debt that was executed in favor of Camden County.

50. As a result, Lexon's exposure was reduced from more than $16.2 million to approximately $9 million.

51. Although Camden County communicated with Lexon regarding its claim to the bond monies, at no point did Lexon disclose the details of its relationships with BPJS Investments, JSDC, and Mr. Potter, *et al*.

52. While Camden County was obviously aware that Lexon and BPJS Investments representatives had communications concerning the assignment of the bonds, the details of the arrangement between BPJS Investments and Lexon were never disclosed.

53. Camden County reasonably believed that Lexon would pay BPJS Investments $16,412,467.50 in bond monies and that these funds would then be used to

complete the infrastructure improvements.

54. Camden County's belief that Lexon would act in good faith was reasonable considering that it had communicated with Lexon, Mr. Maas, and Lexon's engineer, and at no point was it suggested that Lexon would do anything than pay less than what was owed on the bonds.

55. Had Camden County been aware that, from the start, Lexon's primary intent was to avoid paying what was owed under the bonds, Camden County certainly would not have agreed to assign the bonds to BPJS Investments.

56. At present, the whereabouts of the $4,000,000.00 paid to BPJS Investments by Lexon is unknown and the hundreds of lot owners in Bridge Pointe continue to hold lots that lack basic infrastructure such as roads, water, sewer, and electricity.

57. The defendant did not disclose its arrangement with BPJSI to the plaintiff, as required by law.

58. The bonds at issue provide in relevant part: "[...] and the Surety, upon receipt of a resolution of the Obligee indicating that the improvements have not been installed or completed, will complete the improvements or pay to the Obligee such amount up to the Principal amount of this bond which will allow the Obligee to complete its improvements."

### Count I - Actual and Constructive Fraud

59. The plaintiff hereby incorporates by reference all preceding paragraphs.

60. Lexon devised a scheme with the aforementioned individuals to reduce its

exposure of $16,412,467.50 in subdivision bonds.

61. As part of its scheme, Lexon caused to be created several corporate entities which were used to conceal the purchase of certain lots, which were later used as collateral for the assignment of the subject bonds.

62. These lots were purchased with the subject bond monies and these payments of bond monies were not disclosed to Camden County, the obligee, as required.

63. Lexon had a duty to disclose its scheme to Camden County, but did not do so.

64. Lexon acted in concert with individuals affiliated with BPJS investments and these individuals, acting on behalf of Lexon as agents or otherwise, made representations to Camden County concerning the purchase and ownership of the lots which Lexon knew to be either misleading or untrue.

65. Had Lexon disclosed its scheme to Camden County, Camden County would not have assigned its interests in the bonds to BPJS Investments.

66. The aforementioned actions caused Camden County to sustain damages because it no longer can redeem the subdivision bonds and ensure that improvements will be made in the development.

67. Camden County sustained damages in excess of $16,412,467.50.

68. Camden County is entitled to recover these damages from Lexon.

### Count II - Unjust Enrichment

69. The plaintiff hereby incorporates by reference all preceding paragraphs.

70. By assigning the Lexon bonds to BPJS Investmens, the Camden County conferred a benefit upon the Lexon by reducing the Lexon's exposure in the Development.

71. Lexon has retained the benefit conferred upon them by Camden County in the form of a reduction of approximately $7 million of exposure.

72. Equity requires Lexon to compensate Camden County for the benefit conferred upon it.

### Count III - Suppression of the Truth in Violation of O.C.G.A. § 23-2-53

73. The plaintiff hereby incorporates by reference all preceding paragraphs.

74. Lexon did not disclose its plan for reducing its exposure to the plaintiff.

75. O.C.G.A. § 23-2-53 imposed an obligation to disclose the material facts surrounding Lexon's arrangement with BPJS Investments.

76. As a result of Lexon's failure to disclose these material facts, Camden County sustained damages and it is entitled to recover these damages from Lexon.

### Count IV - Breach of Contract

77. The plaintiff hereby incorporates by reference all preceding paragraphs.

78. Lexon began making payments under the subdivision bonds approximately eleven months prior the time Camden County's interests in the bonds were assigned.

79. At the time those payments were made, Lexon was not authorized to make those payments under the terms of its surety agreement.  As a result, the unauthorized payments breached its agreement with Camden County.

80. This breach caused Camden County to sustain damages in an amount to be determined by a jury.

### Count V - Breach of Fiduciary Duty

81. The plaintiff hereby incorporates by reference all preceding paragraphs.

82. By virtue of its status as a surety, Lexon owed Camden County, the obligee, a fiduciary duty.

83. This fiduciary duty required Lexon to act in good faith and disclose the nature of its relationship, agreements, and arrangements with Mr. Potter, *et al*, BPJS Investments, JSDC, and others.

84. Lexon failed to disclose the nature of its relationship, agreements, and arrangements with regard to Lexon's efforts to reduce its exposure under the subject bonds and to pay less than what it was obligated to compensate Camden County.

85. As a result, Camden County sustained damages.

### Count VII - Attorney's fees

86. The plaintiff hereby incorporates by reference all preceding paragraphs.

87. The defendant has acted in bad faith, been stubbornly litigious, and has caused the plaintiff unnecessary trouble and expense.

88. The plaintiff is entitled to the payment of all of its attorney's fees and costs of litigation pursuant to O.C.G.A. §§ 13-6-11 and 9-15-14.

    WHEREFORE, having filed this complaint, the plaintiff prays, as follows:

    (a) that the Court impanel a jury to resolve the issues set forth herein;

    (b) that the Court award actual, compensatory, and general damages as appropriate;

(f) that the Court award the plaintiff interest on any judgment entered, as provided by law;

(g) that the Court award the plaintiff its reasonable attorney's fees and expenses of litigation;

(h) that the Court award punitive damages; and

(i) that the Court award such other legal or equitable relief as it may deem reasonable and proper.

RESPECTFULLY SUBMITTED this 21st day of March, 2014.

        BROWN, READDICK, BUMGARTNER,
        CARTER, STRICKLAND & WATKINS, LLP

        /s/ Garret W. Meader
        G. Todd Carter
        Georgia Bar Number: 113601
        tcarter@brbcsw.com
        Garret W. Meader
        Georgia Bar Number: 142402
        gmeader@brbcsw.com
        Attorneys for the plaintiff

5 Glynn Avenue
Post Office Box 220
Brunswick, GA 31521
(912) 264-8544
(912) 264-9667 FAX

CERTIFICATE OF SERVICE

This is to certify that I have on the 21st day of March, 2014, served all parties in this case in accordance with the directives from the Court Notice of Electronic Filing ("NEF") which was generated as a result of electronic filing.

s/Garret W. Meader<br>Garret W. Meader

BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
P. O. Box 220
Brunswick, GA  31521-0220
(912) 264-8544