# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

CAMDEN COUNTY, GEORGIA,

    Plaintiff,

    v.

LEXON INSURANCE COMPANY,

    Defendant.

DOUGLAS PORCELLI, CENTHIA PORCELLI, STEPHEN AGNONE, ENZO AGNONE, DAVID B. BISHOP, EVA BISHOP, RICHARD W. GARRISON, BERYL K. GARRISON, DANIEL K. HARSHMAN, JATN FAMILY LIMITED, RICHARD E. MUMFORD, SALLY MUMFORD, RICK SWISHER, CINDY SWISHER, FRANCIS G. O'SUCH, VALERIE D. O'SUCH, DOUGLAS WINDSOR, and JOANNE M. WINDSOR,

    Intervenors.

BPJS INVESTMENTS, LLC; GEORGE L. "BOOG" POTTER; MIKE MARTINEZ; ROBERT STEVEN WILLIAMS, SR.; and ROBERT STEVEN WILLIAMS, JR.,

    Third-Party Defendants.

CV 214-20

## ORDER

Before the Court is Defendant Lexon Insurance Company's Motion to Dismiss the Intervenors' Complaint (Dkt. no. 68). The Intervenors own property in a failed subdivision located within

Plaintiff Camden County's boundaries. In overseeing the subdivision's development, Camden County had required the developer to post surety bonds to guarantee that necessary infrastructure could be installed if the developer failed to complete the project. Initially, Defendant Lexon Insurance Company provided these bonds. However, after the first developer went broke, Third-Party Defendants stepped in to develop the subdivision and proposed that Camden County release the Lexon bonds for alternative surety. Camden County agreed to the release. Unfortunately, the Third-Party Defendants were unable to complete the subdivision, and their surety was inadequate to cover the costs of the necessary infrastructure.

This case concerns what went wrong with the development and, particularly, the surety bonds. The various parties are pointing fingers in all directions. But this Order only concerns Intervenors' accusation that Camden County's release of the Lexon bonds and acceptance of alternative security is void as an *ultra vires* act. See Dkt. no. 58 ("Compl."). Defendant Lexon Insurance Company has moved to dismiss Intervenors' sole count under Rule 12(b)(6) for failure to state a claim. Dkt. no. 68. For its part, Camden County agrees with Lexon that Intervenors' Complaint should be dismissed. Dkt. no. 92. Because Camden County generally has authority to dispose of its property as it sees fit and no law specifically proscribes the County from

releasing the surety bonds and accepting alternative security as it did here, Lexon's Motion to Dismiss (Dkt. no. 68) is **GRANTED**.

**FACTUAL BACKGROUND**

The Court draws these facts from the Intervenors' Complaint and accepts them as true in considering Lexon's Motion to Dismiss. See Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1057 (11th Cir. 2007).

The Intervenors hail from across the country—none are Camden County residents. Each of them, though, owns a lot in a subdivision in Camden County, Georgia, known as Bridge Pointe at Jekyll Sound. As property owners, Intervenors pay property taxes to Camden County. Compl. ¶¶ 1-11.

In 2005, a developer going by the name Bridge Point at Jekyll Sound, LLC, planned to develop the subdivision and began accepting lot reservation agreements from prospective lot purchasers. The then-applicable Camden County development ordinances required the developer to obtain surety bonds backing the installation of certain infrastructure in the development. On March 10, 2006, the developer provided eight subdivision bonds to Camden County underwritten by Defendant Lexon. The surety bonds totaled $16,412,467.50 and insured the complete development of necessary infrastructure such as the roadway, curb and gutter, storm sewer, removal of dirt material, lake excavation and construction, waste water disposal system,

electrical and telephone conduit, and other improvements. The bonds identified the Camden County Joint Development Authority as the Obligee, and provided that the Surety, upon receipt of notice that the improvements have not been installed or completed, would complete the improvements or pay the Obligee up to the amount of the bonds for completion of the improvements. Id. at ¶¶ 20-24.

Around May and June of 2006, the developer began selling lots in the subdivision before completing the infrastructure improvements. By late 2008, the developer had sold some 398 residential lots in the subdivision, but had only completed a small part of the infrastructure improvements required by the development code and backed by the bonds. On October 30, 2008, the developer went bankrupt and stopped work on the subdivision. About 286 of the 697 lots remained unsold. Id. ¶¶ 26-31.

Intervenors allege that either Emerson Properties, LLC or Jekyll Sound Development Company, LLC, acquired property in the development from Bridge Point at Jekyll Sound, LLC's bankrupt estate for about $3,050,000. The land included 286 lots, a marsh parcel, and land that would be common areas or amenity locations in the subdivision. Id. ¶¶ 39-40. This land was later transferred to a new entity, Third-Party Defendant Bridge Point at Jekyll Sound Investments, LLC. Id. ¶¶ 43, 49.

Intervenors further allege that, around this time, Third-Party Defendant Steve Williams Jr. gave a presentation to the Camden County Board of Commissioners proposing that the board replace the current surety bonds on the subdivision. Third Party-Defendant Bridge Point at Jekyll Sound Investments would procure the new surety bonds. The Board agreed to this plan at a meeting on January 5, 2010, and Camden County executed a release in favor of Lexon that same day. However, at another meeting on February 16, 2010, Third-Party Defendant George "Boog" Potter, speaking on behalf of Bridge Point at Jekyll Sound LLC, told the board that the investment company had not been able to obtain new letters of credit, and proposed that Camden County accept deeds of trust on 243 lots in the subdivision as substitute collateral on the infrastructure improvements. The Board approved this proposal unanimously without discussion or presentation of any documentation. A few days later, Potter, as chief manager of Bridge Point at Jekyll Sound Investments, transferred a security deed on the 243 lots to Camden County. Id. ¶¶ 41-51.

Intervenors believe that there were several deficiencies in both the procedure and amount of the security deeds. For instance, Intervenors allege that Camden County never required or obtained a title examination for the Security Lots or otherwise determined how many lots Bridge Point at Jekyll Sound

actually owned. Nor did it verify any title insurance policy in connection with the security lots. Id. ¶ 53.

Despite these measures taken to develop the subdivision, no further development work has occurred since February 19, 2010. To this day, the gates to the subdivision remain chained and locked by Camden County and Bridge Point at Jekyll Sound Investments, preventing the lot owners from entering the Subdivision. Camden County has not taken any formal action to collect any amounts payable under the released bonds or to require Lexon to complete the infrastructure improvements in the subdivision. Id. ¶¶ 58-64.

**LEGAL STANDARD**

When ruling on a motion to dismiss brought pursuant to Rule 12(b)(6), a district court must accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor. Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Although a complaint need not contain detailed factual allegations, it must contain sufficient factual material "to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). At a minimum, a complaint should "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th

Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)).

**DISCUSSION**

All parties agree that Intervenors only have standing to bring this suit if Camden County's release of the Lexon bonds was *ultra vires* because Intervenors base their standing on their taxpayer status. A plaintiff challenging the actions of a local government based on his standing as a taxpayer must first show that the government's actions were *ultra vires*. Newsome v. City of Union Point, 291 S.E.2d 712, 715 (Ga. 1982). "For the action to be considered ultra vires, it must appear that the action taken was beyond the scope of the powers that have been expressly or impliedly conferred on the municipality." Id. The Court will thus examine the scope of Camden County's authority to determine if its release of the Lexon bonds and acceptance of alternative security were *ultra vires* acts.

I. **An Overview of Camden County's Conferred Powers**

Generally, two sources of authority demarcate Camden County's power to act under these circumstances: Georgia law, which Lexon and Camden County say grants Camden County the power to dispose of its property as it sees fit; and Camden County's Unified Development Code, the zoning ordinance which Intervenors argue Camden County is bound to follow.

County governments have constitutional and statutory grants of authority to dispose of and manage their property. Under the Georgia Constitution,

> The governing authority of each county shall have legislative power to adopt clearly reasonable ordinances, resolutions, or regulations relating to its property, affairs, and local government for which no provision has been made by general law and which is not inconsistent with this Constitution or any local law applicable thereto.

Ga. Const. art. IX, § 2, ¶ I. And under Georgia statutory law, "[t]he governing authority of each county has original and exclusive jurisdiction over the following subject matters: (1) The directing and controlling of all the property of the county, according to law, as the governing authority deems expedient; . . ." Ga. Code Ann. § 36-5-22.1(a)(1). Camden County, then, has the general authority to dispose of its property "according to law," including local law.

That said, Intervenors argue that there are several portions of the Unified Development Code ("UDC") which bind Camden County to follow certain procedures or otherwise limits its general authority under state law in some circumstances. The general purpose of the UDC

> is to promote the health, safety, morals, aesthetics, convenience, order, prosperity and general welfare of the community, and is intended: . . .
>
> (8) To protect property from blight and depreciation; . . . [and]

8

> (15) To assure the provisions of the required streets, drainage, utilities, and other facilities and services in new land developments to help prevent and reduce traffic congestion, health and safety hazards.

UDC § 104(a)(8), (15) ("Purpose of the development code.") (available at Dkt. no. 39-1).

To achieve these goals, UDC section 1231 governs the "Assurance for maintenance and completion of improvements" for development projects. See UDC § 1231. The section requires a maintenance surety before subdivision plat approval. UDC § 1231(a)(1). The applicant for approval must post a performance guarantee "at the time of application for final subdivision approval . . . ." § 1231(b)(1)(a). An adequate performance guarantee can be in the form of either a letter of credit from a bank or other financial institution or a variety of other guarantees, such as a performance or surety bond, an escrow account, or a property escrow. § 1231(b)(7). If, after a developer has posted a performance guarantee and the final subdivision plat has been approved, the developer fails to complete the required improvements in a timely manner, "the Board of Commissioners may thereupon declare the guarantee to be in default and require that all the improvements be installed regardless of the extent of the construction of said improvements at the time the guarantee is declared in default." § 1231(b)(5). On the other hand, when the improvements have been

completed and approved by the County for conformity to the UDC and are free of any liens or encumbrances, "the performance guarantee shall be released by the Public Works Director and returned to the applicant." § 1231(b)(6).

Thus, while Camden County may have general authority to dispose of its property as it sees fit, the next question in the *ultra vires* analysis becomes whether these UDC provisions limited the authority for Camden County to release the bonds in this case.

## II. The Board's Release of the Lexon Bonds Was Not *Ultra Vires*

The Intervenors argue that, despite the general grant of authority Camden County has to dispose of its property under Georgia law, the UDC is nevertheless a local law that binds the County's official actions. Specifically, Intervenors claim that the Board of Commissioner's release of the Lexon bonds and acceptance of (allegedly inadequate) alternative security either violates the letter of the UDC or, at least, results in an absurd result in light of the UDC's aspirations.

### a. No Provision of the UDC Proscribes the Board from Releasing Surety Bonds Before Infrastructure Improvements are Complete

For an action to be considered *ultra vires*, "it must appear that the action was beyond the scope of the powers that have been expressly or impliedly conferred on the municipality."

10

Newsome, 291 S.E.2d at 715. The challenged action "must be beyond the power or authority of the municipality . . . to perform under any circumstances." Id. at 714. County commissioners are vested by law with broad discretion in handling county affairs, "and the reviewing power of a judge of the superior court should be exercised with caution, and no interference had unless it is clear and manifest that the county authorities are abusing the discretion vested in them by law." Price v. Fulton Cnty. Comm'n, 318 S.E.2d 153, 155 (Ga. Ct. App. 1984) (quoting Lovett v. Bussell, 249 S.E.2d 86, 86 (Ga. 1978)).

In interpreting the relevant laws, "the literal meaning of the words of a statute must be followed unless the result is an absurdity, contradiction, or such an inconvenience that it is clear that the legislature must have intended something else." Colonial Life Ins. Co. v. Heveder, 618 S.E.2d 39, 41 (Ga. Ct. App. 2005) (quoting Mansfield v. Pannell, 404 S.E.2d 104, 105 (Ga. 1991)). That said, the court must still effectuate the intent of the legislature and give "each part of the statute meaning and avoid constructions that make some language mere surplusage." Id.

None of the UDC provisions briefed by Intervenors, by their terms, prohibit Camden County's Board of Commissioners from releasing a performance surety and accepting alternative security after a final plat has been approved. Intervenors argue

that section 1231(b)(6), which states that the Public Works Director "shall" release a performance guarantee upon completion of the improvements, suggests that a performance guarantee may *only* be released upon the completion of the improvements. But this is not the plain meaning of section 1231(b)(6). Section 1231(b)(6) only applies to the Public Works Director, and does not apply to the Board of Commissioners. See § 1231(b)(6) (after completion of the improvements, "the performance guarantee shall be released by the Public Works Director and returned to the applicant."). Furthermore, section 1231(b)(6) does not state that completion of the improvements is the exclusive condition precedent to releasing the bonds—completion is simply a condition which binds the Public Works Director to release the bonds. Thus, while completion of the improvements requires the Public Works Director to release the bonds, it does not follow that the Board of Commissioners cannot release the bonds unless and until the improvements are complete. Section 1231(b)(5) further supports this conclusion: if the developer fails to complete the improvements in a timely manner, "the Board of Commissioners *may* thereupon declare the guarantee to be in default . . . ." § 1231(b)(5). Section 1231, then, does not bind the Board of Commissioners to any course of conduct under any circumstances.

Additionally, the UDC's failure to bind the Board of Commissioners to a particular course of action in section 1231 does not appear to be an unintentional omission, as the Board is bound by non-discretionary language in other UDC provisions. For example, section 1229(h)(5) governs the certification of public improvements as a requirement for final plat approval, and states:

> Upon certification by the Public Works Direct and the Fire Marshal that the public and community improvements depicted on the as-built surveys are in conformance with the specifications of this Development Code and are in good repair, the Board of Commissioners *shall* release the maintenance bond and accept the public improvements into perpetual maintenance.

UDC § 1229(h)(5) (emphasis added). When public and community improvements are certified, the Board of Commissioners "shall" release the bond insuring those improvements. Here, the UDC explicitly requires the Board of Commissioners to act in a certain way under certain circumstances. A failure to do so would be an *ultra vires* act. And the fact that the UDC drafters knew how to bind the Board of Commissioners in some circumstances suggests that the failure to bind the Board under other circumstances was an intentional omission.

UDC section 1231 does not bind the Board of Commissioners or limit its general authority to dispose of its property. And even if section 1231 did bind the Board of Commissioners, all of

13

section 1231's provisions address pre-approval procedures and requirements. The Board's release of the Lexon bonds and acceptance of alternative security *after* final plat approval, then, is not proscribed under section 1231.

### b. Allowing the Board of Commissioners to Release a Bond After Plat Approval but Before the Improvements Are Made Does Not Lead to an Absurd Result

Intervenors argue that if the Board's actions do not clearly violate specific UDC provisions, then the release of the Lexon bonds at least contravenes the purpose and spirit of the UDC and leads to an absurd result. As discussed above, the purpose of the UDC is to "promote the health, safety, morals, aesthetics, convenience, order, prosperity and general welfare of the community," as well as to "promote the orderly and beneficial development and expansion of the County." UDC § 104(a). Intervenors claim that section 1231 promotes these purposes by ensuring that the necessary infrastructure for a development is either in place before plat approval or, as was done here, an adequate performance bond is posted pre-approval to ensure that the infrastructure is completed after the plat is approved. However, if the Board were permitted to release the performance bonds after plat approval and without verifying that either (a) the infrastructure was complete or (b) an adequate substitute bond has been posted, such an approach would create "an absurdity where the Board requires the stated amount of

14

surety or security today, but tomorrow, after final plat approval, the Board can ignore the security requirements completely, leaving the intended beneficiaries of the UDC, including the Intervenors, *unprotected*." Dkt. no. 79, p. 4.

In Georgia,

> It is a cardinal rule of statutory construction that the literal meaning of the statute prevails unless such a construction would produce unreasonable or absurd consequences not contemplated by the legislature. Moreover, in construing language in any one part of a statute, a court should consider the entire scheme of the statute and attempt to gather the legislative intent form the statute as a whole.

Advanced Automation, Inc. v. Fitzgerald, 718 S.E.2d 607, 610 (Ga. Ct. App. 2011) (quoting Ga. Soc. of Ambulatory Surgery Centers v. Ga. Dept. of Cmty. Health, 710 S.E.2d 183, 187 (Ga. Ct. App. 2011)). "When a statute is plain and susceptible of but one natural and reasonable construction, a court must simply follow the literal language of the statute, unless doing so would lead to absurd or wholly impracticable consequences." Lockhart v. Bd. of Regents of Univ. Sys. of Ga., 730 S.E.2d 475, 479 (Ga. Ct. App. 2012) (quoting Fulton Cnty. Bd. of Tax Assessors v. Greenfield Inv. Group, LLC, 721 S.E.2d 128, 130 (Ga. Ct. App. 2011)).

Here, the fact that the subdivision remains shuttered several years after the Board of Commissioners agreed to release the Lexon bonds suggests that the Board of Commissioner's

decision in that particular circumstance did not fulfill the UDC's goals to "protect property from blight and depreciation" and "assure the provisions of the required streets, drainage, utilities, and other facilities and services" in the new development. See UDC § 104(a)(8), (15). However, a bad consequence resulting from the Board's discretion in one instance does not require a finding that the Board's discretion is, in and of itself, "absurd" in all similar situations. The literal meaning of UDC section 1231 is that a developer must guarantee the infrastructure improvements when applying for a final plat application, and the Public Works Director is required to release that guarantee once the improvements are complete. It is not an absurd result under the UDC for the Board—who is not otherwise bound by UDC section 1231—to retain its authority to dispose of the guarantee *after* the final plat has been approved. Retaining that authority, in fact, may help the Board address a developer's bankruptcy by giving it the option to either enforce the guarantee or, instead, allow a new developer to complete the project, backed by a new performance guarantee. Exercising that option may have been imprudent in this case, but the option itself is not an "absurd" result under the UDC requiring this Court to ignore section 1231's plain meaning.

## CONCLUSION

The UDC, by its terms, does not curtail the County's constitutional and statutory right to dispose of its own property as it sees fit. Neither does the County's exercise of that authority by releasing performance bonds after a development's final plat approval amount to an "absurd result" under the UDC. As such, the Board of Commissioner's act of releasing the Lexon bonds in this case was not *ultra vires*, and Intervenors do not have standing to bring their case. Lexon's Motion to Dismiss the Intervenors' Complaint (Dkt. no. 68) is **GRANTED**.

**SO ORDERED**, this 1ST day of September, 2015.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA